## Darlington's Estate.    Darlington's Appeal.

[Marked to be reported.]

*Confidential relations—Duties and obligations incident to such relations.*

The confidential relation is not at all confined to any specific association of the parties to it. While its more frequent illustrations are between persons who are related as trustee and cestui que trust, guardian and ward, attorney and client, parent and child, husband and wife, it embraces partners and copartners, principal and agent, master and servant, physician and patient, and, generally, all persons who are associated by any relation of trust and confidence: Authorities reviewed.

When such relation exists, the party in whom confidence is placed is held to the strictest accountability. The burden is upon him to show that a transaction between himself and his principal, by which he derives benefit, was fair and conscientious and beyond the reach of suspicion.

The rule is founded upon motives of general policy and is irrespective of any admixture of deceit, imposition, overreaching, or other positive fraud. There must be full and clear proof that the transaction was the free and intelligent act of the party, fully explained to him, and performed with a thorough understanding of the transaction and of its consequences.

*Attorney in fact—Uncle and nephew.*

A man 83 years of age went to reside with his nephew, and by letter of attorney conferred upon the latter full power to manage his estate, which amounted in value to about $9,000. Subsequently the nephew presented to his uncle a promissory note for $7,000, which the latter signed stating that it was given for past services and for care during the remainder of his life. After the uncle's death, the note was presented by the nephew before the auditor appointed to make distribution of the estate. The auditor found that at the time the note was made the maker was capable of attending to business:

*Held* that, in the absence of affirmative proof that the maker was informed of the effect which would result from his signing the note, of the proportion of his estate which would be required to pay it, and of the fact that, if paid, but little of his estate would remain for payment of legacies provided for in his will, the note must be held to be void.

Mr. Justice Sterrett and Mr. Justice Mitchell, dissent.

Argued Feb. 10, 1892. Appeal, No. 80, Jan. T., 1892, by Joseph H. Darlington, from decree of O. C. Chester Co., confirming auditor's report, awarding distribution of estate of Caleb Darlington. Before Paxson, C. J., Sterrett, Green, Williams, McCollum, Mitchell and Heydrick, JJ.

Claim on promissory note of the decedent for $7,000.

The facts appear by the opinion of the Supreme Court.

The auditor, John J. Gheen, Esq., rejected the claim. Claimant filed exceptions which were dismissed by the court, Waddell, P. J.

*Errors assigned* were, (1) failure to sustain the exception that the auditor erred in rejecting the note; (2) sustaining the auditor in rejecting the note ; dismissing the exceptions ; confirming the report; and ordering payment in accordance therewith; (3) sustaining the auditor in rejecting the note after having found as a fact that the maker was competent to transact business, and that the contract could not be set aside for inadequacy of consideration.

*William M. Hayes*, for appellant.—This transaction was a contract and not a gift : " The scrutiny in cases of gifts is

more severe and searching than in those of contracts:" Bispham's Eq., sec. 231. No case has heretofore decided that the relation of constituent or attorney in fact is confidential: Darlington's Ap., 86 Pa. 512, and Miskey's Ap., 107 Pa. 611 (cases of imposition) are distinguishable on their facts from this case.

As a question of first impression, there is no reason for holding that the doctrine of confidential relationship applies in the case of an attorney in fact: Pollock on Contracts, 559.

The evidence rebuts the presumption of undue influence.

It shows valid consideration: Citing Miller v. McKenzie, 95 N. Y. 575; Marshall v. Marshall, 75 Iowa, 132; Bush v. Johnson, 11 Ky. L. Rep. 598, 12 S. W. Rep. 758; Rankin v. Wallace, 12 Ky. L. Rep. 97, 14 S. W. Rep. 79; Collins v. Collins, 45 N. J. Eq. 813; Adams v. Adams, (Iowa) 30 N. W. Rep. 795; Conley v. Nailor, 6 Sup. Ct. Rep. 1001; Le Gendre v. Goodridge, (N. J.) 19 Atl. Rep. 543; Kimball v. Cuddy, 117 Ill. 213.

The question lies between the holder of this note and legatees; in other words, between a creditor and mere volunteers.

Thus it cannot be suggested that the uncle had any design to defraud creditors; and if not, even a conveyance would have been good: Chambers v. Spencer, 5 W. 404; Harlan v. Maglaughlin, 90 Pa. 293; Kimble v. Smith, 95 Pa. 69; Posten v. Posten, 4 Wh. 27; Miller v. Pearce, 6 W. & S. 101.

The relation between uncle and nephew is much less close than between father and child, yet even a conveyance by a father to his child is not fraudulent within the statute of 13 Elizabeth, if he has sufficient besides to pay his debts. These are well known doctrines: Sanders v. Wagonseller, 19 Pa. 248; Miner v. Warner, 2 Grant, 448. Much more so in the case of a *note*, for the holder stands, not above, but only on a level with, other creditors.

*Alfred P. Reid*, for appellees.—A trust relationship existed between these parties: Jones v. Wadsworth, 11 Phila. 229; Beeson v. Beeson, 9 Pa. 285.

The relation of principal and agent, or of constituent and attorney in fact, is a confidential relation: Hardwicke v. Vernon, 4 Vesey, 410; Parkist v. Alexander, 1 Johns. Ch. Cas. 396,

Green v. Winter, Ibid. 27 ; Condit v. Blackwell, 22 N. J. Eq. 486, 1 Story's Eq., sec. 315 ; Story on Agency, secs. 210, 211 ; 1 Perry on Trusts, sec. 206 ; Huguenin v. Baseley, 2 Lead. Cas. Eq. 556 ; Persch v. Quiggle, 57 Pa. 247 ; Greenfield's Est., 14 Pa. 506 ; Comstock v. Comstock, 57 Barb. 454.

As to the obligations of a confidential relationship, he cited : Kerr on Fraud and Mistake, pp. 150 and 386 ; Worrall's Ap., 110 Pa. 363; Miskey's Ap., 107 Pa. 611 ; Bispham's Eq., sec. 238 ; Wilson's Ap., 99 Pa. 545 ; Fox v. Mackreth, 1 Lead. Cas. Eq. 242 ; Darlington's Ap., 86 Pa. 512; Wistar's Ap., 54 Pa. 60; Parker's Adm'rs v. Parker, 5 Atl. Rep. 586 ; Huffman v. James, 11 Atl. Rep. 444.

A conveyance of property in consideration of future support is void as to creditors: Miner v. Warner, 2 Grant, 448 ; Sanders v. Wagonseller, 19 Pa. 248 ; Johnston v. Harvey, 2 P. & W. 82 ; Kirker v. Johnson, 13 W. N. C. 385.

OPINION BY MR. JUSTICE GREEN, March 21, 1892.

The instrument, the validity of which is called in question in this contention, is a promissory note.   It is a note for $7,000 which was given by the testator, Caleb Darlington, to his nephew, Joseph H. Darlington, on the 6th of November, 1889, payable six months after date.   There was no money consideration for the note.   Three daughters of Joseph H. Darlington testified that at the time the note was signed they were present and heard Caleb Darlington say that it was given for past services, and for taking care of him during the rest of his life. At the time of his death in December, 1890, Caleb Darlington was about eighty-five years of age, consequently he was about eighty-four years old when the note was signed.   The daughters of the payee testified that the note was already filled up when it was produced by their father, and that Caleb Darlington then signed it and handed it to their father, the payee.   The auditor finds that it was in July, 1889, when Caleb Darlington went to live with his nephew, and he remained there until his death in December, 1890, during which time he was cared for by Joseph H. Darlington and his family.   The auditor further finds that, on the 19th of July, 1889, the testator executed a letter of attorney to Joseph H. Darlington, giving him power to transact all his business, to collect all moneys due or to be-

come due to him, and to disburse the same in payment of debts and obligations, and concluding with the following clause : " I authorize and empower him to do whatever shall to him seem proper for the protection of myself and my estate, and I hereby ratify and confirm whatsoever my said attorney may do in his discretion in relieving me of all care and responsibility, and in discharging whatever duties he may see proper to perform, which in his judgment may be for my best interests." Under this letter of attorney, Joseph H. Darlington proceeded to collect moneys due to his principal on different securities owned by the latter, and continued doing so until, as the auditor finds, he had received $2,137.74, which he still held at the death of Caleb Darlington. It does not appear that he reinvested any of the money or paid any of it over to his principal. When the $7,000 note was obtained from Caleb Darlington, November 6, 1889, the latter had been living less than four months with his nephew, and in that same time, according to the testimony of David McFarland, Joseph H. Darlington had collected about $900 of his uncle's money.

The daughters of the nephew did not testify to any negotiations between the uncle and nephew at the time the note was given, but only to a single declaration, which they said the uncle made, that the note was given for services rendered, and for taking care of him the rest of his life. There was no proof of any actual services rendered by Joseph H. Darlington to Caleb Darlington, at any time before July, 1889, and the auditor finds that, " It does not appear what the services rendered consisted of nor the extent of them." In fact there is nothing on this record to prove that Joseph H. Darlington had ever rendered any services of any kind to his uncle at any time in his life, prior to the time in July, 1889, when the latter came to live with his nephew.

By the express terms of the letter of attorney Joseph H. Darlington undertook the duty of protection of his uncle and his estate, and the uncle agreed to ratify and confirm whatever his attorney might do for the best interests of his uncle. The auditor found that Joseph H. Darlington accepted the trust appointing him the attorney of his uncle and his agent for protecting his estate, and that a confidential relation thereupon arose between them. It is difficult to understand how the fact

of such relation can be called in question.    The specific power conferred by the letter of attorney was to transact all business which the principal might or could do, and to collect all moneys due or to become due to him, and to pay all his debts and obligations, as well as the debts and obligations which the attorney might contract in performing his duties.

In addition to this, the attorney was also authorized to do whatever he pleased for the protection of his principal's estate, and to further his best interests.    It was for the protection of his *principal's* estate, and the furtherance of *his* best interests, that the attorney undertook the duty which fell upon him as such.    It was not the property and interests of the attorney, but of his principal, that were to be protected and cared for. This duty of care and protection is essentially a trust and confidence.    In the law of principal and agent, nothing is better settled than that the agent is disqualified from dealing with the property of the principal for his own advantage.    He cannot buy his principal's property, even from the principal himself, except upon the fullest disclosure of every matter which may affect its value.    He is treated by the law precisely as trustees are treated who seek to make profit for themselves out of their trust relation.    Their transactions are always voidable at the mere option of the cestui que trust: 1 Perry on Trust, § 206; Persch v. Quiggle, 57 Pa. 247; 1 Story Eq. § 315; Story on Agency, §§ 210, 211; Condit v. Blackwell, 22 N. J. Eq. Rep. 486; Huguenin v. Baseley, 2 Lead. Cases in Eq. 556, 580.

We have no hesitancy in agreeing with the auditor and court below in holding that a confidential relation arose between the uncle and nephew after the letter of attorney was executed, and the duty it imposed was undertaken by the attorney.    He became then and thereby charged with the special trust and confidence of protecting the property of his principal, and of managing it, so as to promote the best interests of his principal. Whatever was done by him in hostility to that duty was a breach of the trust and confidence reposed in him.    The confidential relation is not at all confined to any specific association of the parties to it.    While its more frequent illustrations are between persons who are related as trustee and cestui que trust, guardian and ward, attorney and client, parent and child, husband and wife, it embraces partners and copartners, principal

and agent, master and servant, physician and patient, and, generally, all persons who are associated by any relation of trust and confidence.   When the relation exists the consequent duties and obligations are perfectly well established by long settled law.   In the case of Yardley v. Cuthbertson, 108 Pa. 395, the relation was that of a scrivener to his employer in the writing of a will.   The entire subject was much discussed, and the duties following the relation fully considered and practically enforced.   We there held that, where a scrivener was employed to write a codicil to a will, he became subject to a confidential relation with his employer, the testator, and could take no considerable interest as a legatee in the will, without being subject to the duty of making full disclosure to the testator of the approximate amount of the estate, of the proportionate amount of the estate which would pass to the scrivener under the legacy in his favor, and of proving by affirmative testimony that the testamentary provision in favor of the scrivener was the free, voluntary and intelligent act of the testator, and unaffected by any undue influence of the scrivener.   Quoting from the case of Butlin v. Barry, 1 Curt. 614, we said: " Where a paper has been drawn up by a person for his own benefit, or where he takes a considerable benefit under it, the presumption lies strongly against it, and it requires to be proved by satisfactory evidence dehors the instrument, that it was the free and voluntary act of a capable testator, and executed with a full knowledge of its contents and effect."   In the principal case, after citing many authorities, we said: " It is almost unnecessary to add, that this is a rule of general application to all kinds of instruments, the procurers of which are large beneficiaries by virtue of their operation.   It is a rule of equity and of very ancient origin.   In its ordinary statement the fact of mental weakness in the grantor does not appear, and is not at all necessary to the application of the rule in a given case. Many, if not most, of the judicial illustrations of its application, are devoid of this element."

In Greenfield's Est., 14 Pa. 489, this court set aside a provision in a deed of trust, which gave a large compensation to the trustees, one of whom was the lawyer who wrote the deed, although the grantor was of perfectly sound mind, and the deed was read over to her, and was left with her to read by

herself, before execution, because of the confidential relations
of attorney and client, or scrivener, upon the ground that the
compensation was excessive, and that affirmative proof was not
given that full explanation was made to the grantor of the
character and effect of the provision in question. All the
other provisions of the deed were sustained. It was not the
case of a gift, but of a provision fixing the compensation of
trustees, who were thereafter to perform services as trustees·
of the trust estate conveyed by the deed. Were it necessary,
it would be profitable and instructive to make extended quo-
tations from the very elaborate and exhaustive opinion of the
court delivered by Mr. Justice BELL. A few of them will
suffice, and will dispose of the whole contention in the present
case. The trust estate in the case cited was of the value of
about $200,000. There were four trustees, and the compen-
sation of each for managing the trust was fixed in the deed
at $10,000, amounting in the whole to $40,000, or about one
fifth of the estate. BELL, J., said : " As a reward for the future
management of the estate, worth, at the utmost, only five
times as much, the sum named has been well designated as in-
ordinate. Yet this fact will by no means justify a charge of
actual fraud against the parties who principally managed this
transaction. As already intimated, there is no proof in the
cause to warrant so grave an accusation. . . . But, in spite
of this concession, a rule of public policy and pure morals,
founded in long experience of the human heart and knowledge
of man's cupidity, interposes to forbid the allowance of the
claim. In this feature the case presents what is called a con-·
structive fraud, springing from the confidential relations exist-
ing between the parties. This peculiarity, withdrawing it from
the operation of ordinary rules, throws upon the beneficiaries
the duty of showing expressly that the arrangement was fair
and conscientious, beyond the reach of suspicion. In requir-
ing this, courts of equity act irrespective of any admixture of
deceit, imposition, overreaching or other positive fraud. It is
founded upon a motive of general policy, and is designed to
protect a party, so far as may be, against his own overweening
confidence and self-delusion, the infirmities of a hasty judg-
ment, and even the impulses of a too sanguine temperament.
It has been beneficially applied to those confidences which owe

their birth to the relation of parent and child, guardian and ward, trustee and cestui que trust, and, above all, attorney and client. To guard against the strong influences which these connections are so apt to originate, the law not only watches over the transactions of the parties with great and jealous scrutiny, but it often declares transactions absolutely void, which, between other parties, would be open to no exception. This is emphatically true of the relation of client and attorney, and to persons standing in a situation as quasi guardians or confidential advisers. Many of the cases establish the doctrine that, while these connections exist in full vigor, the adviser shall take no benefit to himself from contracts or other negotiations with the advised. . . . Other authorities, where the transaction is one of contract and sale, conceding that it may not be absolutely void, ipso facto, throw upon the agent the burden of establishing its perfect fairness and adequacy, and that it was the deliberate act of the confiding party, after being fully informed of his rights, interests and duties, and put upon his guard against even the suggestion of his own inclinations. It must appear affirmatively that no advantage has been taken of the client; and, if this be not affirmatively established, uberrima fide, equity will treat the case as one of constructive fraud. An attorney or other confidential adviser is not permitted to avail himself either of the necessities of his client or of his good nature, liberality or credulity, to obtain undue advantages, bargains or gratuities." Much more of the same tenor is contained in the opinion, and the application of the doctrine to the facts of that case was made without the least evidence of actual fraud or undue influence, and although the grantor was entirely competent mentally. It was not a case of gift, but of contract for future service, in which the compensation was fixed in the deed. It was only twenty per cent of the whole estate, and was to be divided among four trustees, making the compensation of each only five per cent of the whole. Yet it was set aside by the application of the principles above stated.

In the case of Wistar's Ap., 54 Pa. 60, we affirmed a decree made by the court below, upon the account of a trustee who was surcharged, ALLISON, J., delivered the opinion of the common pleas, in which he said: " The objection to the finding

of the auditor rests upon the principle that gifts, judgments, notes, or other securities given by clients, cestui que trusts, principals or wards, to their attorneys at law, trustees, agents or guardians, are treated as constructive frauds, and the burden of proving their perfect fairness, and the consideration for which they were given, is upon the latter; and if no such proof be established no recovery can be had thereon. Where a claim is sought to be established by one holding a fiduciary relation to another against the person or estate which he is required to protect, the burden of establishing the claim, both as to its fairness and consideration, rests upon him who asserts his demand."

In Darlington's Ap., 86 Pa. 512, this court set aside a deed for a tract of land made by a wife to her husband, through a third person, more than thirty years after it was made, although it was acquiesced in by the wife during the whole of her life, and although there was no proof of fraud, imposition, undue influence or mistake, and the deed was regularly acknowledged by the wife, who was mentally competent, before a magistrate, who said she signed without hesitation. The bill to set the deed aside was brought by the wife's son in 1872, and the deed was executed in 1841, and reserved a life estate for the wife. In delivering the opinion, our late brother TRUNKEY, after stating the general rule which disqualifies one occupying a confidential relation with another, from acquiring advantages, bargains, or gratuities from the other party, said: "But the burden of establishing its perfect fairness, adequacy and equity is thrown upon the attorney. If no such proof is established, courts of equity treat the case as one of constructive fraud. In dealings between principal and agent, or guardian and ward, or trustee and cestui que trust, the same principles prevail, with a larger and more comprehensive efficiency; and the burden of proof is upon the agent, the guardian, or the trustee who claims a benefit, arising from the transaction, to show the utmost good faith on his part, that he took no advantage of his influence or knowledge, and that he brought everything to the knowledge of the other party which he himself knew."

In Worrall's Ap., 110 Pa. 349, we set aside a deed for a tract of land made by a young man, soon after attaining his majority, to a woman who had been his nurse and attendant

for a number of years, but who was not related to him in any manner, and between whom and himself there was no confidential relation other than such as grew out of her attentions to him. He desired to compensate her for her services to him, because he thought his father had not done so sufficiently. He was entirely competent mentally, and he had advice; he understood thoroughly what he was doing, and there were no circumstances of fraud, imposition, or undue influence brought to bear upon him. We held, under the evidence, that the relation was one of a confidential nature, and on that account, and because of the absence of the requisite affirmative proof in support of the conveyance, we treated it as a case of constructive fraud, and set it aside upon that ground, notwithstanding the proof of long-continued and faithful service on the part of the grantee.

Applying these principles to the facts of the present case, we find that Caleb Darlington was eighty-four years old when he signed the note, that he was very feeble and infirm, and died of old age in about thirteen months thereafter, that not a particle of proof was given to show that he was informed what effect would result from his signing the note, what proportion of his estate it would require to pay it, or how it would affect his control over his property. Not one word of explanation was made to him when he signed the note; it was not even shown that he read the note, or knew the amount of it, and he had no independent advice. Not a particle of proof was given of the making of any contract even, for his future maintenance, and nothing was given in evidence, except a single declaration, that it was given for past services and for waiting on him, or taking care of him in the future. But he did not say, and it was not proved, that he knew the amount he was promising to pay. As to the past services, the declaration was a clear delusion, because there were none. Was the amount then a reasonable compensation for the future maintenance? As the nephew actually collected $2,100 from the personalty, and the farm sold for $6,800, the value of his estate was about $9,000. The interest of this sum would be over $500 a year. He was a bachelor, with no one depending upon him, and of simple and inexpensive habits. He was not afflicted with any loathsome disease, and his probabilities of life were very short indeed.

It would seem that the income of his estate alone would prob-ably support him, or very nearly so. It was the duty of the attorney to protect his principal's estate, and act only for his best interests, yet, within four months after the relation was established, he had practically obtained from his principal, for his own private gain, almost the whole of his estate.

In Greenfield's Est. the compensation to be paid for the fu-ture service was only twenty per cent of the whole estate, and it was to be divided among four; here it was very nearly the whole of the estate, and was all to be taken by the attorney. Such a contract, in such circumstances, is grossly unreasonable and unconscionable, and cannot be sustained. It comes clearly within the principles heretofore stated, and the very numerous authorities to be found in the books, which condemn all such transactions, not because there was mental incapacity or any proof of actual fraud, but because of the relation between the parties, and the absence of that full and satisfactory proof that the contract in question was the free and intelligent act of the party fully explained to him, done upon and after full infor-mation of the extent of his property and its effect' upon his estate, with a thorough knowledge of the contract and all its consequences. Moreover, the auditor allowed the nephew to retain the whole $2,137 of money which he had collected for his uncle, as compensation for all his services during the seven-teen months his uncle lived with him, and that amount was much more than ample compensation for those services. No part of the $7,000 is needed for that purpose. It must not be forgotten that Caleb Darlington had made his will on Aug. 3, 1889, by which he gave certain pecuniary legacies, amounting to $600, and the residue of his estate to his brother. Under the findings of the auditor, if the $7,000 note is to be paid, there will be little or nothing left to pay the pecuniary lega-cies, and no residuary estate for the testator's brother. It can-not be believed that, if the attention of the testator had been called to this fact when he signed the note, he would have con-sented to impose such a liability upon his estate. In any event it was the plain duty of the agent to fully explain this aspect of the subject to his principal before procuring from him his sig-nature to so important an obligation. There was no such evi-dence in the case. Many further considerations, and many more

authorities, could readily be shown in support of the conclusion that this instrument cannot be sustained, but it is quite unnecessary. We are clearly of opinion that the decree of the court below should be affirmed.

The decree of the orphans' court is affirmed, and all the costs of the proceedings are imposed upon the appellant.

MR. JUSTICE STERRETT and MR. JUSTICE MITCHELL, dissent.